## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
### Bid Protest

| | | |
|---|---|---|
| LOCKHEED MARTIN CORPORATION | ) | |
| 1701 West Marshall Drive | ) | REDACTED VERSION |
| Grand Prairie, Texas 75051, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 15-1536C |
| v. | ) | (Judge Lettow) |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff, Lockheed Martin Corporation ("Lockheed Martin," "Company," or

"LOC"), respectfully submits this action regarding a contract award made by the U.S.

Department of the Army, Army Contracting Command ("Agency" or "Army") to

Oshkosh Defense, LLC ("Oshkosh") under Solicitation No. W56HZV-14-R-0039 ("RFP"

or the "Solicitation") for the Joint Light Tactical Vehicle ("JLTV") program.[1]

### *Preliminary Statement*

1.      The JLTV program is valued at more than $6.5 billion. It is a Joint Army

and Marine Corps program to provide vehicles, along with companion trailers, capable

of performing multiple missions while providing protected, sustained, and networked

mobility for personnel and payloads across the full spectrum of military operations.

---

[1]      This revised complaint for declaratory and injunctive relief is being submitted on
December 22, 2015 to conform the citations with the re-numbered set of exhibits being
submitted pursuant to the Court's request during the December 18 status conference.
ECF No. 17-1. All exhibit citations are to the "JLTV-PI-XXXX" number printed at the
bottom of each exhibit page (not to the page numbers from the original document).

2.      The production phase of the JLTV program at issue in this protest follows earlier stages of development. The contract at issue will involve several years of low-rate production and will transition to full-rate production. The low-rate production vehicles will involve further testing for Reliability and performance, after which full rate production will begin and the vehicles will be placed into service.

3.      Lockheed Martin filed a protest of this matter at the U.S. Government Accountability Office ("GAO") on September 8, 2015. The primary issue in that protest concerned the Reliability of the offered vehicle solutions, specifically how many miles they could run between a "hardware mission failure" and the related issue of the extent to which they would be "operationally available" based on such Reliability. During the immediately preceding Engineering and Manufacturing Development ("EMD") phase of the program, Reliability, Availability, and Maintainability ("RAM") were subject to extensive testing.

4.      Reliability had ramifications for both the technical risk evaluation and the evaluated cost/price. The solicitation called for a massive downward price adjustment for evaluation purposes based on the offeror's proposed Reliability. As a result of the Agency's flawed evaluation of Lockheed Martin's proposal and the accompanying misleading discussions, Oshkosh won ███████████████████ the award being challenged—based on the difference between the offerors' proposed Reliability.

5.      GAO conducted a hearing in the protest on November 18, 2015. Earlier in the bid protest, the Agency presented a declaration by an evaluator who attempted to

explain away statements and documents that the Agency claimed constituted the only documentation of its evaluation of the technical portion of the proposals. During the GAO hearing, the evaluator testified similarly. The declaration and testimony were inconsistent with the documentation provided by the Agency as its contemporaneous record.

6.     On December 3, 2015—more than two weeks after the hearing and two weeks before the GAO decision was due—the Agency informed GAO that it had become aware of an electronic folder containing thousands of documents regarding the JLTV procurement that had not been provided. GAO directed the Agency to produce the documents.

7.     The belated materials raised substantial issues regarding the previously produced record and the bases on which the GAO bid protest had been litigated. For instance, during the GAO proceeding, the Agency represented that the evaluators did not take any notes when performing their work on the offerors' proposals—which explained the Agency's supplementation of the record with a declaration and testimony that attempted to further describe what happened during the evaluation. Although the Agency testimony during the GAO hearing asserted that there were no evaluation notes, the late-produced documents included material labeled "Notes."

8.     During the procurement and throughout the GAO protest, the Agency took the position that its personnel did not undertake any calculations of Reliability for the offered solutions, *e.g.*, they did not perform a "quantitative" assessment during the

evaluation process. The documents produced at the end of the GAO process demonstrated that such calculations were undertaken over a sustained period and that the Agency's position was incorrect .

9.      These late-produced documents also included briefings that were made to the SSA which had not been provided previously. Although the SSA testified at the GAO hearing, the information about the evaluation in these briefings had not been produced previously by the Agency.

10.     Due to the belated production of such responsive and probative documents, Lockheed Martin could not have confidence in the documentation of the evaluation, in terms of what it stated and whether it had been produced. The late-produced documents were inconsistent with statements made by the Agency before GAO. If Lockheed Martin had been provided the documents in a timely manner, it would have pursued different issues and lines of argument in the GAO protest. It would have requested different witnesses to testify and asked different questions. The entire conduct of the GAO protest would have differed.

11.     Although GAO directed the Agency to produce the documents, GAO informed the parties on December 8, 2015 that it would not consider the newly produced documents in its decision to be issued on or before December 17, 2015. GAO stated that Lockheed Martin could file new grounds, which would be addressed in a subsequent decision. Because it was denied the opportunity for a decision that

addressed the protest allegations based on a complete record of the evaluation, Lockheed Martin gave notice to GAO and the parties of the intent to file this action.

12.     The critical merits issue is whether an offeror's proposed Low Rate Initial Production ("LRIP") vehicle design meaningfully varies with respect to Reliability from the configurations tested in the prior (EMD) phase. If a design meaningfully varied, the Solicitation called for offerors to provide substantiating data to address the impact of the changes. The Agency required Lockheed Martin to ████████████████████████ ████████████████████████████████, asserting that a "change is a change is a change." The Agency applied a very different standard to Oshkosh. Although Oshkosh made a ████████ number of changes, it was not asked to substantiate anything and did not substantiate the impacts of ████████ changes with information that the Agency should have considered.

13.     The record shows that in its LRIP proposal, Oshkosh disclosed design changes ██████████████████████████████████████████████████████. However, the Agency failed to subject Oshkosh's changes to the standard applied to Lockheed Martin. Moreover, the Agency credited Oshkosh for improving Reliability through changes that the Agency asserted elsewhere could not impact Reliability. Indeed, even when Oshkosh's own proposal showed that changes Oshkosh proposed ████████████████████████████████, the Agency ignored these representations and found that the changes could ████████████████████ The Agency did not pose a single question to Oshkosh.

████████████████████████████████████████████

14.     The evaluation documents reflected an *ad hoc*, inconsistent, and unequal approach to assessing Reliability. At the outset, the Agency had no standard to assess meaningful variation; it then adopted differing tests that were applied inconsistently to the proposals. The prejudice of that misevaluation was pervasive: it drove a difference in ratings between the offerors because the Agency overweighed certain factors, including Reliability, relative to what the RFP stated.

15.     As a result of the misevaluation, the Agency also denied Lockheed Martin ████████████████████████████████████████████████████████. Instead, the Agency permitted Oshkosh to reap a substantial benefit in evaluated cost/price as a result of its inconsistent and unequal approach to evaluating Reliability. Reliability ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████.

16.     In short, the evaluation was arbitrary, unequal, and prejudicial.

### Parties

17.     Lockheed Martin is a corporation that is incorporated and maintains its headquarters in Maryland. Lockheed Martin has pursued the JLTV contract through its Missiles and Fire Control business unit, the relevant office of which is located in Grand Prairie, Texas.

18.     The Army is a component of the U.S. Department of Defense.

19.     The awardee, Oshkosh Defense LLC, is a subsidiary of Oshkosh Corporation, which (according to its Form 10-K), is a company that is incorporated and maintains its headquarters in Wisconsin.

## *Jurisdiction and Standing*

20.     The Court has jurisdiction over this bid protest matter under 28 U.S.C. § 1491(b).

21.     Lockheed Martin has standing to bring this action because it was an actual offeror for the procurement that submitted a compliant proposal. Lockheed Martin is the largest aerospace and defense contractor in the nation and successfully performed contracts for the two prior phases in the JLTV program. But for the substantial errors demonstrated in this protest, Lockheed Martin would have had a substantial chance for award of the contract at issue.

## *Statement of Facts*

**A.      The RFP—Issuance and Overview of JLTV Procurement**

22.     The Agency issued the RFP on December 12, 2014.

23.     This procurement is for three years of Low Rate Initial Production (LRIP) and five years of Full-Rate Production ("FRP") for up to slightly less than 17,000 vehicles.

24.     This phase follows two prior phases of the program: (i) Technology Development and (ii) Engineering and Manufacturing Development ("EMD"). In the immediately preceding EMD phase. Lockheed Martin, Oshkosh, and a third entity

(AMF General, LLC) were awarded contracts. The EMD contracts provided for the fabrication, assembly, integration, testing and test support, and related requirements to develop the JLTV vehicles.

25.     The contract at issue involves production of a family of vehicles ("FoV") "comprised of two variants, a four-seat and a two-seat variant," and "a companion trailer (JLTV-T) and associated kits." Ex. 1 (RFP § C.1.1.1). The contractor must provide vehicles, kits, trailers, and other products and services on a fixed-price and cost-reimbursement basis.

**B.      The RFP Evaluation Criteria**

26.     The RFP features three evaluation criteria, listed in descending order of importance: Primary Technical; Total Evaluated Cost/Price (TEC/P), and Small Business Participation. *Id.* (RFP § M.1.1). Regarding relative importance, the RFP states:

> Primary Technical is more important than TEC/P. TEC/P is significantly more important than Small Business Participation.

*Id.* The "non-TEC/P factors, when combined, are significantly more important than the TEC/P Factor." *Id.*

27.     The technical evaluation focused on an assessment of the risk associated with numerous aspects of the offerors' proposals. *See id.* (RFP § M.4.1) (as "the Government will only assess risk" under this factor, the evaluators "will not identify 'strengths' and 'weaknesses when evaluating proposals"). The Agency promised to "assess the proposal risk that the Offeror's JLTV will achieve the Government's defined

threshold performance levels for each [Purchase Description ("PDFOV")] requirement identified in Attachment 0061 (Primary Technical Performance Requirements List)." *Id.* (listing 25 Purchase Description requirements). The RFP explained that "each PD requirement identified in Attachment 0061 is weighted equally and will be evaluated as such." *Id.* (The "Purchase Description" is included as Attachment 0001 of the Solicitation and defined the requirements for the JLTVs. The Purchase Descriptions rows, which contain individual requirements, are labeled PDFOV, and for consistency, we use that term below.)

28. In regard to data for the evaluation, the RFP explains that the Agency "will review the proposal data and information required in Section L under the Primary Technical Factor to conduct its Primary Technical evaluation of the Offerors proposal." *Id.* (RFP § M.4.1.1). In the RFP, the Agency also "reserves the right to utilize Government Test Data not provided in the Offerors proposal in addition to the substantiating data provided in the Offerors proposal in the evaluation of the offerors primary technical factor." *Id.* The RFP further states:

> Government test data which establishes conformance to the proposed design configuration represents the most credible form of substantiating data. Therefore, any substantiating data for a design configuration which meaningfully varies from the offered design configuration may be considered less credible. The greater the extent to which the Offerors proposed design configuration meaningfully varies from the originally tested configuration or testing conducted under different conditions, the greater the probability that the Government may discount the relevance of the test data as substantiating information. Substantiating data other than government test data will be considered less credible.

*Id. (*RFP § M.4.1).

29.     Offerors could propose solutions that satisfied or exceeded threshold

performance requirements. Indeed, the RFP provides incentives to propose features that

exceed the Purchase Description's requirements. For example, RFP section M.4.1.2

("Exceeding Threshold Performance") states that proposals for "performance beyond

the Government defined threshold . . . that is supported by credible substantiating data

may be assessed at a reduced risk of achieving the threshold performance level." *Id.*

### 1.     Reliability

30.     One Purchase Description requirement concerns Reliability. The relevant

requirement is in row "PDFOV-2909" of the "JLTV Purchase Description." RFP

Attachment 0001 at 96 ("Main Body"). There, the RFP requires that the "JLTV shall

demonstrate at a minimum, a point estimate of 3,800 Mean Miles Between Hardware

Mission Failure (MMBHMF)." *Id.* The Purchase Description requirements also include

the related requirement for Operational Availability (PDFOV-2918), which is a product

of the Reliability of the vehicle.

### 2.     Demonstration of Reliability in EMD

31.     During the earlier EMD phase, the Agency tested the Reliability of the

vehicles by driving eight vehicles roughly 20,000 miles each in accordance with

specified operating modes and mission profiles for the JLTV. The Agency calculated the

"demonstrated" Reliability as a result of these road tests by dividing the number of

miles driven by the number of hardware mission failures ("HMFs"), which yielded the Mean Miles Between Hardware Mission Failure ("MMBHMF").

32.     During EMD, Lockheed Martin demonstrated an MMBHMF of ██

████████████████████████. Ex. 2 at 113. Oshkosh demonstrated an MMBHMF of

██████████████████████ Ex. 3 at 128.

**3.     Assessed Reliability—The Effect of Improvements**

33.     During EMD, the Agency assessed the Reliability of contractor solutions after the EMD road testing in a two step process. *First*, the Agency determined whether an incident that occurred during road testing was a hardware mission failure by applying the Failure Definition and Scoring Criteria ("FDSC"). Only incidents that resulted in a hardware mission failure were counted. *Second*, the Agency reviewed and assessed the contractors' proposed corrective actions or "fixes" for hardware mission failures that occurred during testing. The assessment of contractor-proposed fixes occurred at what was known as the "EMD Assessment Conference." Three variables were considered:

(i)      understanding of the root cause of the failure;

(ii)     certainty of failure rate improvement/prevention control that would be realized when the corrective action is made; and

(iii)    test results (*e.g.*, component or system level) to verify the effectiveness of the corrective action.

The three variables are known as "Fix Effectiveness Factors." A contractor can receive a rating of 0.0 to 0.3 for each variable, for a maximum rating of 0.9 for each corrective action, *i.e.*, fix. That rating, in turn, is applied against the number of failures.

████████████████████████████████████████████

Application of the Fix Effectiveness Factors results in a Reliability projection. A reduction in the number of failures results in a higher (better) "assessed" Reliability than the vehicles demonstrated on the road as it takes into account the benefits of corrective actions that will prevent the recurrence of the identified causes of failures.

34. Through the EMD assessment process, Lockheed Martin's solution was assessed an MMBHMF of ███. Ex. 2 at 117. The Oshkosh solution was assessed an MMBHMF of ███. Ex. 3 at 129.

**4.    Proposed Reliability—RFP Provisions Regarding Reliability**

35. Subsequent to EMD and during the procurement, to the extent an offeror proposed revisions to its previously tested EMD configuration and assessed design changes, the RFP described how such information would be analyzed. RFP section L.4.1.4 explains that offerors can provide a wide variety of substantiating data to support the performance of certain requirements, including Reliability (PDFOV-2909). Ex. 1. The data had to be provided in a specified format, *i.e.,* it "shall be in the form of Government test data, third party test data, Offeror test data, manufacturers specification sheets, certified modeling and simulation data, safety confirmations, material release information, analytical support, design documentation and/or rationale." *Id*.

36. The RFP encouraged offerors to propose ways to improve Reliability—or provide "Reliability growth"—in the future. For instance, offerors could provide a "Reliability Improvement Plan in which they are required to "identify candidates for

continued Reliability growth above the requirements in the [PDFOV]." Ex. 4 (CDRL

D003). Under the RFP:

> The Plan shall outline a structured method to mature the system's reliability through the identification of failure modes, root cause analysis, and implementation of corrective actions. Each candidate shall outline forecasted improvements in reliability. As part of the Plan, the Contractor shall develop and deliver a reliability growth curve.

*Id.*

37.    RFP section C.2.2 also describes the "Reliability, Availability, and

Maintainability (RAM) Program" that offerors are required to propose. Part of that

RAM program involves the offeror's "Reliability Improvement Plan," under which:

> For the life of the contract, the Contractor shall develop, implement, and deliver a Reliability Improvement Plan for identifying candidates for ***growing reliability above the requirements in the JLTV Purchase Description (Attachment 0001)***. The Reliability Improvement Plan shall outline a structured method to mature the system's reliability through the identification of failure modes, root cause analysis, and implementation of corrective actions. (CDRL D003, Reliability Improvement Plan)

Ex. 1 (RFP § C.2.2.3) (emphasis added).

**5.    TEC/P and the Impact of Proposed Reliability on Evaluated Cost/Price**

38.    RFP section M.4.2 requires the Agency to assess each offeror's TEC/P by

determining the offeror's "Evaluated Contract Cost/Price" then subtracting up to four

"adjustments" from that amount. *See id.* The TEC/P calculation would be performed as

follows (with the adjustments explained in the referenced sections of the RFP):

TEC/P = Evaluated Contract Cost/Price (M.4.2.2)
         *minus* Life Cycle Cost Adjustment (M.4.2.3)
         *minus* Technical Data Package Adjustment (M.4.2.4)
         *minus* Tier 1 Objective Requirements Adjustment (M.4.2.5)
         *minus* Secondary Technical Adjustment (M.4.2.6)

39.     Although each of these adjustments affected the award decision, the Life

Cycle Cost ("LCC") adjustment is of crucial importance. RFP section M.4.2.3 explains

that the LCC adjustment offers evaluation credit to the extent an offeror proposes

credible "anticipated cost avoidance based on the degree to which [a] proposed design

reduces the Government's Operations and Sustainment costs for consumable and

reparable parts, and fuel necessary to sustain and operate the Offerors proposed

vehicles." *Id.* The adjustment is calculated under a formula provided in RFP Attachment

0071 and is based on "the Offeror's proposed Operating Fuel Efficiency (PDFOV-3388),

Idle Fuel Consumption Rate (PDFOV-8192), Mean Miles Between Hardware Mission

Failure (PDFOV-2909), Vehicle Prices, and Contractor Furnished Equipment Kit Prices."

*Id.*

40.     With respect to the LCC Adjustment, the RFP also explains that

"[p]roposed LCC inputs . . . will not be evaluated for risk under the LCC Adjustment

evaluation." *Id.* That said, "for the selected Offeror, the levels of performance proposed

by the Offeror . . . will be incorporated into the contractually binding Purchase

Description as the threshold requirement." *Id.* Under this provision, and the

calculations performed in the spreadsheet included as an attachment to the RFP,

offerors could receive increasing credits in the LCC evaluation based on greater

proposed Operating Fuel Efficiency, or a reduced Idle Fuel Consumption Rate, or a greater proposed MMBHMF.

41.    The potential credit from (and impact of) the TEC/P calculation can be enormous. For example, ███████ MMBHMF initially proposed by Lockheed Martin would result in an LCC credit of approximately ███████. During discussions, the Agency ████████████████████████████████████████████████ ████████████████████████████ Lockheed Martin's final proposed MMBHMF ████ produced an LCC credit of ████████████████████████████████

42.    RFP section M.4.2.5 provides an additional financial incentive for proposing an MMBHMF performance level exceeding the RFP's threshold. Under that provision, a downward Tier 1 Objective Requirements Adjustment could be made to the TEC/P based on the Agency's assessment of the value of the increased capability associated with the offeror's proposed performance, *i.e.*, it proposed an MMBHMF that was higher than the Reliability threshold of 3,800. *Id.* For example, Lockheed Martin initially proposed ██████ MMBHMF, which would result in a Tier 1 Objective credit of ████████████████████████████, Lockheed Martin's current MMBHMF amount ███████ results in a credit of ████████████████.

## C.    Lockheed Martin's Proposal and Discussions

43.    Lockheed Martin submitted its initial proposal on February 10, 2015. It proposed the following JLTV FoV:

Ex. 5 at 147 (LM Proposal Vol. 1). The Agency also received proposals from Oshkosh and AM General, LLC—and determined that all three proposals were in the competitive range. The Agency conducted discussions with Lockheed Martin, which resulted in

44.     In its initial proposal, Lockheed Martin proposed

*E.g.*, *id.* at 148. Lockheed Martin's proposed

. Lockheed Martin proposed to

1. **The Agency's Discussions with Lockheed Martin Were Misleading**

   a. **The Agency Unequally Pressed Lockheed Martin** ███████████████

45.    On April 16, 2015, as part of discussions, the Agency issued an evaluation notice ("EN") that explained that ████████████████████████████████████ ███████████████████████████████████████████████ ██████████████████████████ Ex. 6 at 150. The evaluators asserted that Lockheed Martin ████████████████████████████████ ████████████████████████████ *Id.* The Agency also asserted that Lockheed Martin ████████████████████████ ██████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████

46.    Lockheed Martin responded by ████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ███████████████████." Lockheed Martin's EN response also █████████ ████████████████████████████████████ ███████████████████

47.    The Agency responded to Lockheed Martin on the same day (May 7) with "EN 24B." Although the Agency assessed ███████████████ during the EMD

17

████████████████████████████████████████

phase, the Agency explained that █████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████ Ex. 7 at 151. The Agency further informed

Lockheed Martin:



*Id.* at 153. With respect to ██████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████

    48.    On the same day the Agency sent EN 24B (May 7, 2015), it responded to

Lockheed Martin's question from May 6, which asked ███████████████████

█████████████████████████████████████████████████████. Lockheed

Martin posed the question ████████████████████████████████████████

██████████████████████. The Agency responded that it "is not calculating an

assessed MMBHMF value based on an offeror's proposal." Ex. 8 at 154. As Lockheed

Martin would later learn when the Agency made its eleventh-hour production, this was

not accurate. In fact, the Agency had calculated MMBHMF figures as of that date.

Moreover, the late-produced documents show that the Agency continued to do so into June 2015. *See* Exs. 9 and 10. Before these documents came to light, the Agency denied during the GAO proceeding that there was any such quantitative analysis performed in its Reliability evaluation.

49.    At the same time the Agency was telling Lockheed Martin that it was not calculating an assessed MMBHMF value, the evaluators were conducting further discussions with Lockheed Martin regarding Reliability. These resulted in additional EN responses:

| EN No. | Issued by Agency | LM's Response |
| --- | --- | --- |
| _PT_024A | April 24 | May 1 |
| _PT_024B | May 7 | May 15 |
| -- | -- | May 29 |
| -- | -- | June 1 |
| -- | -- | June 26 |

The Agency also conducted oral discussions with Lockheed Martin regarding Reliability (and other matters) on the following dates in 2015: May 5, May 18, May 20, June 2, July 13, July 23, and July 27.

### b.    The Agency's Statements to Lockheed Martin Regarding ███████████████ Change Were Not Accurate

50.    In mid-May 2015, Lockheed Martin responded to an Agency EN and explained that, ████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████. (The FDSC are the criteria by which HMFs are determined and are provided by the Agency in the solicitation.)

51. The misleading statements to Lockheed Martin were not limited to the question ████████████████████████████████████████████ Critically, during oral discussions on May 20, 2015, Lockheed Martin ████████████ ████████████████████████████████████████████ ████████████████. According to the Agency's notes, ██████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████. Ex. 11 at 177. Lockheed Martin sought to clarify ████████████████████████████████████████████ The Agency told Lockheed Martin that "a change is a change is a change." *Id.* ████████████ ████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████

**c. The Agency Unfairly Pressured Lockheed Martin To** ████████████████████████████

52. Although the Agency stated during discussions with Lockheed Martin that "a change is a change is a change"—and thus ████████████████████████ ████████████████████████████████—during the GAO proceeding, the Agency revealed that the evaluators were of a very different view. Specifically, the

████████████████████████████████████████████

Agency submitted a declaration stating that the Agency was only concerned with ten changes to the design. Indeed, the Agency had created another list of specific changes that it considered to be notable during discussions. But that list was not provided to Lockheed Martin. Instead, Lockheed Martin was forced to █████████████ ███████████████████████████████████████████████████████████

53. Unknown to Lockheed Martin, the Agency also had a different view of the value of further substantiation than it revealed in the RFP or in discussions. The day before the May 20, 2015 discussions session, Agency officials conferred internally with regard to the Reliability evaluation and discussions regarding the Lockheed Martin proposal. As recounted in Agency notes, they concluded:



Ex. 12 at 184. During the GAO proceeding, the Agency denied repeatedly that the evaluators had prepared any notes. The quotation above was taken from a document contained in the belated production entitled "Notes from meeting with Chris," which was authored by the same evaluator who testified that the evaluators did not take any notes. When the Agency produced the documents (on December 5, 2015), the evaluator provided an additional declaration, taking the position that the evaluator understood the term "notes" as used in the GAO testimony to refer only to handwritten notes. (No such qualification was made during the GAO hearing.)

54.     The notes identified in the paragraph above reflect that the Agency understood Lockheed Martin's proposal would more likely suit the Agency's views if ███████████████████████████—and that providing additional ███████████ would not matter. The Agency denied during the GAO proceeding that it placed any pressure on Lockheed Martin to ████████████████████ ███████████████████████. The notes quoted above are inconsistent with the Agency's position. Again, they were not produced until the end of the GAO proceeding and would not have been considered by GAO when it wrote its decision.

55.     Notwithstanding the criticism in the May 19 notes of the prior "main message" of encouraging Lockheed Martin to ███████████████, the Agency in fact encouraged Lockheed Martin to ███████████████ in the May 20, 2015 discussions by explaining that a "change is a change is a change." Following the May 20 discussions, Lockheed Martin ███████████████ in response to discussion EN "24B" (described above). Lockheed Martin's May 29 "EN 24B" response ████████████████████████████████████ ██████████████████████████████████████████ ███████████████████████████████████.

████████████████████████████

#### d. The Agency Did Not Inform Lockheed Martin That the Evaluators Had Questions About ████████ ██████████████

56. In a further revision to its discussion response, EN 24B REV B (May 29, 2015), Lockheed Martin explained that the Company ████████████████████ ███████████████████████. As a result of the Government's views as expressed to Lockheed Martin, the Company ██████████████████████████████████

57. The Agency did not understand ██████████ in Lockheed Martin's response to EN 24B, but it did not ask any follow-up questions. In a set of edits to the draft Primary Technical evaluation included in the late-produced documents, an evaluator explained that the submission was not "understood" by the Agency. Ex. 15 at 196. The edits of the Agency's Primary Technical evaluation document for Lockheed Martin reflect that the Agency considered issuing a discussion question to understand Lockheed Martin's response. *Id.* at 199. However, although discussions remained open, the Agency chose not to obtain that information so that it could understand the response to EN 24B. In subsequent edits, the Agency struck the reference to a lack of understanding from the Primary Technical evaluation document. Ex. 16 at 205. The Agency thus declined to address its lack of understanding and excised the reference from the formal record. Accordingly, Lockheed Martin did not have an opportunity to address the Agency's lack of understanding during discussions.

58. During the GAO proceeding, the Agency asserted that Lockheed Martin provided ██████████████ rather than what the Agency considered to be relevant

█████████████████████████. The Agency never informed Lockheed Martin

during discussions that ████████████████████████████████████████████

████████████████████████████████████████████████████████.

**2.** **Late-Produced Documents Demonstrate That the Agency Recognized Its "a Change Is a Change Is a Change" Instruction Was Inaccurate—and Failed To Correct It**

59.    In material dated August 14, 2015 prepared for a briefing to the SSA, the

Agency noted that it understood ██████████████ a certain portion of the Lockheed

Martin changes ████████████████████████████████████████████

██████████████). However, the Agency lacked understanding with respect to █

████████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████. Notations for the speaker on the briefing

slides state:

██████████████████████████████████████

██████████████████████

Ex. 17 at 210.

60.    Contrary to what Lockheed Martin was told, the Agency did not expect

that ██████████████████████████, even though it had told Lockheed Martin "a

change is a change is a change." Instead, the Agency was concerned about less than a

dozen design changes for Lockheed Martin, primarily the ██████████████ changes.

In a June 2015 briefing to the SSA, the Agency identified roughly 10 "notable" changes

in this regard. Ex. 18 at 211.

███████████████████████████████████████████████

61.     In the same June 15, 2015 Reliability briefing to the SSA, the Agency specifically called out a handful of "notable" changes for Oshkosh. The Agency never posed a question to Oshkosh about those "notable" changes.

62.     In a declaration provided during the GAO proceeding, the Reliability evaluator (who later testified) stated that, in fact, only 10 Lockheed Martin changes ██████████████████████████████. Ex. 19 at ¶ 33. The evaluator dismissed █ other Lockheed Martin changes as posing minimal or no impact to Reliability. This cannot be reconciled with the Agency's May 20, 2015 position that ████████████ ██████, *i.e.*, "a change is a change is a change." The Agency never told Lockheed Martin otherwise.

63.     On July 23, 2015, the Agency informed Lockheed Martin that its proposed approach to PDFOV 2909 — ████████████████████████████████ ██

64.     Following discussions, the Agency sought final proposal revisions and asked that they be submitted on July 30, 2015. Lockheed Martin submitted its final proposal on that date.

**D.     The Oshkosh Proposal and Discussions**

      **1.     Oshkosh's Proposed Changes**

65.     The Oshkosh proposal identified ██████ changes that Oshkosh characterized as ████████████████████████████████████

█████████████████████████████████████████████████████████████

████████. None of them was meaningfully evaluated by the Agency.

     **a.**    **Oshkosh Completely Redesigned** ████████

66.    Oshkosh's proposal included a change—which is referred to as Baseline Change Notice ("BCN") ████████████████—that was not included in the group of post-EMD LRIP changes identified by Oshkosh. Oshkosh's proposal states that the change was a ████████████ from the EMD as-tested design. Ex. 20 at 247. The proposal further states that the change was not included in any EMD test vehicles. The change, which affects a mission critical component of the vehicle's ██████ system, is not referenced or discussed in any Agency evaluation document.

67.    During the protest at GAO, the Reliability evaluator who attempted to provide an explanation for the undocumented evaluation of this issue declared that the change was taken into account in the demonstrated Reliability during EMD testing, *i.e.*, the evaluator believed it was part of the road testing. However, the re-designed ██████ had never been installed in any vehicles that were tested. *See* Ex. 20 at 247. The Agency thus declared that Oshkosh had road tested a part that Oshkosh recognized had never been included in any test vehicles.

     **b.**    **Oshkosh**████████████████████████**Without Question From the Agency**

68.    In its proposal, Oshkosh recognized that ████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

26

█████████████████████████████████████████

███████. Ex. 21 at 271. Notwithstanding, in its Primary Technical evaluation document, the Agency credited Oshkosh with an assessed Reliability of ██████ and assumed that all of this was ███████████████ for purposes of the evaluation.

69.     Oshkosh included █████████████████████████████████████ ██████████████████ in an appendix to its proposal. Oshkosh explained that ████ ███████████████████████████████████████████. Despite Oshkosh's ████████ ████████████████ the Agency assumed that Oshkosh's proposal did not meaningfully vary for purposes of Reliability.

70.     For these ██████ changes, Oshkosh claimed ████████████████ ██████████████████████. For the remaining ████████ design changes, Oshkosh provided ███████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████ The Agency accepted these assertions without posing any questions during discussions.

        c.     **Oshkosh Made Changes ███████████████████████**

71.     In its proposal, Oshkosh offered a variety of post-EMD changes that████ ██████████████████████████████████████████████████ such as ████████████████████████████████████████████████████████ ████████████████████. The potential for █████████████████████████ posed by these and other changes was identified and described in a declaration from a Lockheed Martin Reliability consultant during the GAO protest. Had the Agency



performed an analysis, these ▮ changes would have been considered meaningful variances from the EMD as-tested configuration under the standard applied to Lockheed Martin (*i.e.*, "potential to cause an HMF"), and they should have resulted in further inquiries or discussions with Oshkosh regarding the need for substantiating data. No such inquiries or discussions occurred. During the protest, the Agency's written statements, the evaluator's declaration, and testimony at the GAO hearing never addressed these issues or explained why the Agency did not consider these changes during the evaluation.

72.     In evaluating Lockheed Martin's proposal, the Agency focused on whether a proposed post-EMD design change impacted a system or component that had been the subject of a corrective action during EMD. The Agency referred to such changes in stating: ███████████████████████████████████

██████████████████." Ex. 2 at 114. In the corresponding evaluation document for Oshkosh, there is no mention of any consideration of post-EMD changes by Oshkosh to systems or components that were the subject of corrective actions during EMD.

73.     Oshkosh implemented ▮ corrective actions during EMD, and in its proposal, it ████████████████. Ex. 3 at 129. A review of Oshkosh's post-EMD changes (*i.e.*, changes after EMD Reliability testing) reveal at least █████████

██████████████████████████ in which Oshkosh changed a system or component ██████████████████████████████

██████████████████████████████

████████████████████████████████████████████████████ ████████████████████████ (That is, Oshkosh had █████ corrective actions which were ████████████████████████████████████████.)

### d.    Oshkosh Changed a Prior Fix for its ██████████

74.    During the earlier Reliability testing that occurred as part of EMD, Oshkosh's vehicle experienced ████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████. Oshkosh ████████████████ ████████████████████████████ Oshkosh then ████████████████████ ████████████████████████████████████████████████████ ██████████████████████████. BCN ████ was never part of any vehicle testing. This change includes ████████████████████████████████████████. Under the "potential to cause an HMF" criteria applied to Lockheed Martin, this change is a meaningful variation of a previously-implemented EMD corrective action.

### e.    Oshkosh Changed a Prior Fix for its ██████████

75.    During EMD Reliability testing, Oshkosh experienced ██████████ ████████████████████████████████████████████████████ ██████████████████. The root cause of the ████████████████████████████ ████████████████████████████████████████████████████ ██████████████████. The corrective action for this HMF, which was implemented as part of BCN ████ during EMD, involved the incorporation of ████████████████████

████████████████████████████████████████████████████

redesign of the ███████████████████████████. Post-EMD change BCN ███ which was implemented to ████████████████, resulted in subsequent changes to ██████████████████████████████████████████████████ ██████████████████████████████████████████████. These ██████ changes were necessary to ████████████████████████████ ███████████████████████████████████████████████ ████████████████. Under the criteria applied to Lockheed Martin (potential to cause an HMF), this change constituted a meaningful variation of a previously-implemented EMD corrective action.

### f.  Oshkosh Changed a Prior Fix for its ███████████████

76.  During EMD Reliability testing, Oshkosh's vehicle experienced failures with the ████████████████████████████████████████████ — which the Agency scored as an HMF. Oshkosh implemented a corrective action (BCN ████) to address this HMF, proposing to modify the ████████████████████ ██████████████. BCN ███ impacts the corrective action implemented in BCN███. As described above, BCN ███ changes the ████████████████████████ ████████████████████████████████████████████████████ ████ BCN███ also █████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████. Under the criteria applied to Lockheed Martin (potential to cause an HMF), this change to a prior corrective action is a meaningful variation of an EMD

████████████████████████████████████████████████

corrective action. However, the Agency did not evaluate the change as a meaningful variation.

### g. Oshkosh Changed a Prior Fix for its █████████

77.     During EMD Reliability testing, ████████ failures on the Oshkosh vehicle resulted in an HMF when ███████████████████ because of ████████████ ███████████████. Oshkosh implemented BCN ██, which ███████████ ████████████████████████████████████████. Post-EMD change BCN ██ implements a redesign of the vehicles' ███████████████████ ████████████████████████████████████████. This redesign affects the ███████████████ ██████████ . ████████████████████████████████████████ ███████████████████. Under the criteria applied to Lockheed Martin (potential to cause an HMF), this change would be treated as a meaningful variation of an EMD corrective action.

* * *

78.     The Agency did not conduct any discussions with Oshkosh regarding these Reliability-related issues.

### 2. The Agency's Recalculation of EMD Assessed Reliability

79.     Although the Agency stated to Lockheed Martin during discussions that it was not calculating MMBHMF figures in its evaluation, the documents belatedly

31



produced on December 5, 2015 make clear that the Agency had done so—and continued to make such calculations throughout discussions. These documents reflect that for the Lockheed Martin proposed vehicle configuration, the Agency determined an MMBHMF of ██████ subject to a revised Fix Effectiveness Factor score of ██ for various areas in which discussion questions were still outstanding. Ex. 9 at 166. Even at that time, and with questions outstanding, the Agency assessed that Lockheed Martin ██████ ████████████ the 3,800 MMBHMF threshold.

80.    For Oshkosh, the assessments reflected a █████ MMBHMF █████ than Oshkosh proposed. Ex. 10 at 168. However, changes in the FDSC scoring criteria (noted by Oshkosh itself) should have ████████████████ Oshkosh's MMBHMF ████████████. These assessment documents also reflect that the Agency viewed certain Oshkosh corrective actions from EMD as ███████████████████████████████████ ████████████████████████ stating that the change "████████████████████████████

81.    The assessments referenced in the two paragraphs above reflect a recalculation by the Agency of corrective actions that had been performed during EMD by the EMD assessment conference as proposed fixes to hardware failures. During the hearing at GAO, the Agency's Reliability evaluator testified that Lockheed Martin's corrective actions from EMD were viewed as areas requiring substantiation in the proposal—even if they had been reviewed and assessed by the EMD assessment conference. Although the initial Oshkosh assessment ███████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

the evaluators subsequently abandoned that approach to Oshkosh's benefit.

## E.    The Evaluation Documents

82.    From the outset of the competition, the Agency summarily concluded that Lockheed Martin's proposed design ████████████████████████████ and Oshkosh's did not. The Agency took the position during the protest at GAO that one Primary Technical document for each offeror constituted the entirety of the evaluation. The late-produced documents contain several different versions of the Primary Technical evaluation documents which do not reflect analysis but only conclusions in this regard. Further, the documents produced at the end of the proceeding reveal that the Agency did not apply a consistent standard for assessing what constitutes a meaningful variation.

83.    For example, initial versions of the evaluation document for Oshkosh show conclusions, with analysis. *See* Exs. 13 and 14. A version of the Lockheed Martin Primary Technical document dated April 29 states:

> According to LOC, the ██████ that occurred in EMD can be binned as ████████ modes. For these ████ modes:
>
> - ██ Corrective Actions ("CA") were implemented in EMD and remain constant within proposed design. As these changes are included within EMD test results, there is no impact to test data relevance.
>
> - ██ CAs were implemented in EMD and then updated in the proposed design configuration. This meaningfully varies from EMD test configuration and reduces the relevance of EMD test data.

33

████████████████████████████████████████

- ██ CAs were not implemented in EMD and are included in the proposed design configuration. This meaningfully varies from EMD test configuration and reduces the relevance of EMD test data.

Additionally, as part of the proposed design configuration, LOC is ███████████████████████ ██████████████████████ These design changes result in a proposed configuration that meaningfully varies from the as-tested EMD configuration. Therefore, relevance of EMD test data is decreased.

Ex. 22 at 277-78. The same phrasing was included in versions through March and April

2015, except that the earlier versions listed particular changes as examples ██████

████████████████████████████████████████████████████

██████) in the last paragraph quoted above.

    84. Following reviewer comments that requested an explanation for why the

design varied, the Agency revised the text above to state:

According to LOC, the ████████ that occurred in EMD can be binned as ███████████ modes. For these ██████ modes:

- ██ CAs were implemented in EMD and remain constant within the proposed design. As these changes are included within EMD test results, there is no impact to test data relevance.

- ██ CAs were implemented in EMD and then updated in the proposed design configuration. *The ████████* ███████████████████████████ *the quantity of design changes,* results in a proposed design that meaningfully varies from EMD test configuration. This reduces the relevance of EMD test data.

- ██ CAs were not implemented in EMD and are included in the proposed design configuration. *The ████████* ███████████████████████████

████████████████████████████████████████████

████████████████ *the quantity of design changes*, results in a proposed design that meaningfully varies from EMD test configuration. This reduces the relevance of EMD test data.

Additionally, as part of the proposed design configuration, LOC ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████. The relevance of EMD test data is reduced because ████████████ ████████████████████ *the quantity of design changes*, results in a proposed design that meaningfully varies from EMD as-tested configuration.

Ex. 23 at 284 (emphasis shows changes from previous version).

85. As of June 30, the Agency modified the last paragraph to read:

Additionally, as part of the proposed design configuration, LOC ████████████████████████████████████████ ████████████████████████████████████████ ████████████████. *These design changes have the potential to cause a Mission Essential Function (MEF) failure and therefore meaningfully vary from EMD test configuration. This reduces the relevance of EMD test data*.

Ex. 24 at 292 (emphasis shows changes from previous version).

86. Unlike the Primary Technical evaluation document for Lockheed Martin, the Primary Technical document for Oshkosh does not contain any reference to changes that impact prior corrective actions. The Oshkosh evaluation thus appears to assume that, contrary to the view taken with regard to Lockheed Martin, no previously

implemented corrective actions to address HMFs were impacted by any post-EMD changes.

87.     The final Primary Technical evaluation document for Lockheed Martin states:



> LOC█████████████████████████████████████████████. These design changes have the potential to cause a Mission Essential Function (MEF) failure and therefore meaningfully vary from EMD test configuration.

Ex. 2 at 114. The statement reflects that the design was deemed to meaningfully vary because of the "potential" for an HMF. Before the GAO, the Agency repeated that standard, stating: "Because several of these changes have the potential to cause a HMF, they were determined to meaningfully vary." Agency's Supplemental Combined Statement at 21. (With its reports in the GAO bid protest, the Agency submitted combined Contracting Officer statements and legal memoranda.). There is no reference to the probability or likelihood of a failure. There is no similar reference to a standard based on "potential to cause an HMF" in the Primary Technical document for Oshkosh. At the GAO hearing, the Agency's Reliability evaluator asserted that, notwithstanding the text in the Primary Technical document, which the evaluator authored, the Agency did not base its assessment of meaningful variation for Lockheed Martin on "the potential to cause an HMF."

88.     In defending against the protest at GAO, the Agency contended:

> The Army cannot assume that a design change will have a
> positive, negative, or no effect on reliability without credible
> and relevant substantiating data.

Agency's Combined Statement at 34. The Agency further asserted that each offeror had

to establish, with substantiating data, its "proposed levels of performance for the

proposed design (including all changes) regardless of whether or not the offeror

deemed the change as meaningful. Proposed performance must be substantiated." *Id.*

89.    Despite Oshkosh ██████████████████████████████████, the

Agency determined that Oshkosh's proposed design did not meaningfully vary from

the EMD as-tested configuration in regard to Reliability. Oshkosh's proposal states that

the:



Ex. 25 at 298 (emphasis added.)

90.    The Primary Technical document for Oshkosh states:

> design changes specifically address ████████████
> ████████████ As these changes are the
> ██████████████████████████████████
> Therefore, these design changes are determined to have no
> impact on the relevance of EMD test data.

Ex. 3 at 129. At the GAO hearing, the Agency evaluator asserted there was no

relationship between the clause ██████████████████████████████████



and the subsequent clause "these changes do not meaningfully vary from the EMD as-tested configuration." In contrast, the Primary Technical document for Lockheed Martin does not refer to any consideration of ████████████████ in the context of Reliability.

91.     After the reference to the ██ Oshkosh design changes identified in the paragraph above, which are set forth in a separate bulleted paragraph, the Primary Technical document for Oshkosh states:

> ██ design changes address ████████████████
> ████████████████████████████ The remaining
> changes were reviewed for impact to Mission Essential
> Functions (MEF) and were determined not to meaningfully
> vary from the EMD as-tested configuration. Therefore,
> relevance of EMD test data is not impacted.

*Id.* At the GAO hearing, the Agency evaluator asserted that, contrary to a plain reading of that paragraph and notwithstanding the term "remaining," all Oshkosh design changes were reviewed for impact to hardware mission failure.

92.     The Agency's Oshkosh Primary Technical document asserts:

> OSH provided substantiating data [Appendix C.45 – LRIP
> RAM Projections] to summarize the LRIP BCN impacts for
> post EMD design changes. The data found in Appendix C.45
> was derived from EMD test data, ████████████████
> ████████████████████████████████████
> ████████████████████████████████████
> ████████████████████████████. This
> ████████ substantiates reliability impacts of changes not
> related to EMD HMFs.

*Id.* at 130. For these changes, Oshkosh claimed █████████████████████████
███████████ The pages at issue address ██████ post-EMD design changes. These changes
also were counted within the categories of ██ and ██ changes noted above, which the
Agency asserted had no impact on Reliability. In asserting that the data "substantiates
reliability impacts of changes not related to EMD HMFs," the Agency credited the same
changes both as impacting and not impacting Reliability. The Agency's Primary
Technical document for Oshkosh thus is inconsistent with regard to the changes.

93. Before the GAO, the Agency submitted a declaration in which the
principal Reliability evaluator (who later testified) asserted that *all* of Oshkosh's post-
EMD design changes would have either no impact to Reliability or a minimal impact.
That assertion encompassed the ██████ changes addressed in Appendix C.45 of the
Oshkosh proposal. The declaration thus contradicted █████████████ and the
assertion (on page 49 of the Agency's Primary Technical evaluation document) that the
"analysis" provided in the Oshkosh proposal ███████████████████████
█████████████████████."

**F.   The Agency's Award Decision**

94. On August 25, 2015, the Agency informed Lockheed Martin that the
Company had not been selected for award. The Agency reported the following results:

| Factor | Lockheed Martin | Oshkosh |
|---|---|---|
| Primary Technical | ████████████████ | Low |
| Total Evaluated Cost/Price* | | $2,698M |
| Small Business Participation | | Good |

*Represents total evaluated cost price, as described in RFP Section M.4.2.

██████████████████████████████████████

95.    In conjunction with the debriefing of Lockheed Martin on September 2, 2015, the Agency provided the following risk rating definitions that were used for the evaluation:

| Primary Technical Risk Ratings | |
| --- | --- |
| **Risk Rating** | **Description** |
| Very Low | Proposal clearly meets requirements. Credible substantiating data demonstrates risk of unsuccessful performance is very low. |
| Low | Proposal meets requirements. Credible substantiating data demonstrates risk of unsuccessful performance is low. |
| Moderate | Proposal is likely to meet requirements. Credible substantiating data demonstrates risk of unsuccessful performance is no worse than moderate. |
| High | Proposal does not clearly meet requirements. Substantiating data demonstrates risk of unsuccessful performance is high. |
| Unacceptable | Proposal does not meet requirements and therefore contains one or more deficiencies. Proposal is unawardable. |

Ex. 26 at 303.

96.    In the source selection decision document ("SSDD"), the SSA noted that the Oshkosh and Lockheed Martin proposals meaningfully varied from their respective EMD design configurations. Ex. 26 at 307. He asserted that the "O[shkosh] proposal stood out for generally providing Government test data (the most credible substantiating data) as substantiating data for requirements where the offered design configuration meaningfully varied from the configuration tested by the Government." *Id.* The SSDD states that "when . . . [Lockheed Martin's] offered design configuration meaningfully varied from the configuration tested by the Government, the Company ███████████████████████████████████████████████." *Id.* That resulted in ███████████ ████████████

████████████████████████████████████████████████████

97.     The Agency provided the following assessments of Oshkosh and

Lockheed Martin:

| Requirement | LOC | OSH |
|---|---|---|
| PDFOV-9185 (VCI1 ) | | Low |
| PDFOV-7478 (Sand Slope) | | Very Low |
| PDFOV-8198 (CH53K - 2 Ext) | | Low |
| PDFOV-8452 (MPS - 58' platform) | | Low |
| PDFOV-8453 (78" Height - A&G Deck) | | Low |
| PDFOV-1786 (C4I SR/EW Arch) | | Low |
| PDFOV-1984 (IA) | | Low |
| PDFOV-2909 (MMBHMF) | | Low |
| PDFOV-2918 (Ao) | | Very Low |
| PDFOV-3162 (Roof Crush) | | Very Low |
| PDFOV-3338 (Operational FE - PTMPG) | | Very Low |
| PDFOV-8192 (Static FE Idle - gal/hr) | | Very Low |
| PDFOV-8722 (GP - CW) | | Very Low |
| PDFOV-8208 (GP - Payload) | | Very Low |
| PDFOV-8723 (CCWC - CW) | | Low |
| PDFOV-8214 (CCWC - Payload) | | Very Low |
| PDFOV-8724 (UTL - CW) | | Very Low |
| PDFOV-8220 (UTL - Payload) | | Very Low |
| PDE-7 (Side) | | Low |
| PDE-56 (Side Transparent) | | Very Low |
| PDE-112 (Under Body) | | Low |
| PDE-17 (Opaque KE) | | Low |
| PDE-115 (Transparent  KE) | | Low |
| PDE-118 (Wheel) | | Very Low |
| PDE-121 (Underbody) | | Low |
| **Factor Risk Rating** | | **Low** |

*Id.* at 306.

98.     The SSDD also addressed the Reliability evaluation. The SSA explained

that although Lockheed Martin ███████████████████████████████████

████████████████████████████████████ during EMD, the Company

had ████████████████████████████████████████████████████████████

████████████████████████████████████.” *Id.* at 307.

According to the SSDD, those changes ████████████████████████

████████████████████████████████████████████████████████ *Id.*

████████████████████████████████████████████

99.    With respect to the Reliability evaluation of Lockheed Martin, the SSA

explained his disagreement with aspects of the evaluators' judgments. The SSDD stated:



*Id.* at 308 (emphasis added.)

100.    With respect to the Agency's evaluation of the "Total Evaluated

Cost/Price Factor," the evaluation results are as follows:

| All prices are in BY11$ | LOC | OSH |
|---|---|---|
| **Evaluated Contract Cost/Price** | | $ 5,587,956,112 |
| **LCC Adjustment** | | $ 1,527,321,615 |
| **TDP Adjustment** | | $ 511,000,000 |
| **Tier 1 Adjustment** | | $ 229,228,263 |
| **Secondary Technical Adjustment** | | $ 622,177,924 |
| **Total Evaluated Cost/Price** | | $ 2,698,228,310 |

Ex. 26 at 308-09.

101.     As noted above, Lockheed Martin had been assessed ███████████
██████████████████████████████. However, the SSA determined that ██████████
█████████████████████ Oshkosh was the best value for the Government.

**G.      The Impact of Reliability on Availability**

102.     Availability (PDFOV-2918) is a product of vehicle Reliability. In general,
Availability is a measurement of the percent of time that a JLTV vehicle is capable of
starting a mission. As such, it is affected by how often mission hardware fails
(Reliability) and how long it takes to repair when it fails (maintenance ratio). MMBHMF
is one of two variables in the Agency's calculation of Availability; the other is
Maintenance Ratio; four other constant terms were fixed by the Agency for evaluation
purposes. The Agency's Primary Technical evaluation documents rely on the same text
and analysis as its Reliability explanation in significant part, and thus reflect the close
relationship between the two.

103.     The Agency rated Lockheed Martin ████████████ for Availability.

104.     The EMD assessment conference assessed value for Maintenance Ratio for
Lockheed Martin ██████████ Lockheed Martin proposed ███████████████████
████████████████████████████████████████████
████████████████████████████████████████████████
█████████████████████████████████████████
████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████. Accordingly, Lockheed Martin █████████████████

████████████████████████████████████

████████████████████████████████████████

██████████████████████████. In its evaluation, the Agency characterized

the Lockheed Martin proposed ████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

███████

105.    In rating Lockheed Martin ██████████████, the Agency relied on the

MMBHMF assessment.

**H.    Lockheed Martin's Protest at GAO**

106.    On September 8, 2015, Lockheed Martin timely filed a protest at GAO.

Lockheed Martin timely supplemented the protest on September 14, 2015 based on

information provided during the September 2 debriefing.

107.    On October 9, 2015, the Agency asserted in response to Lockheed Martin's

request for production of "evaluators' notes, emails, memoranda, and other

documentation" that "none exist."

████████████████████████████████████████████

108. On and after October 14, 2015, the Agency produced its report in response to the Lockheed Martin initial and first supplemental protests. The report included portions of the offerors' proposals and discussion responses, certain evaluation documents identified as relevant by the Agency, and certain EMD test reports. The Agency did not produce any evaluators' notes or work product, which it previously stated to GAO did not exist.

109. On October 26, 2015, Lockheed Martin timely supplemented its protest based on the documents provided by the Agency and included a declaration from a Reliability consultant explaining the █████████████████████████████ █████████████████████ that had not been identified or addressed by the Agency in its evaluation.

110. On November 5, 2015, the Agency produced a second report, but no documents. That report, however, included a lengthy declaration from the Agency's Reliability evaluator articulating a new standard for meaningful variation, *i.e.*, whether if a design change "could" result in an "HMF" it was "likely" to do so. Ex. 19. The evaluator asserted that no Oshkosh design changes were likely to result in an HMF.

111. On November 18, 2015, GAO conducted a hearing.

112. On December 3, 2015, the Agency notified GAO and the parties that attorneys for the Agency had become aware of "the existence of an electronic folder where miscellaneous documents related to JLTV were maintained" and that such

████████████████████████████████████████████████████

documents were being reviewed for responsiveness to GAO's direction regarding document production.

113. On December 4, 2015, GAO directed the Agency to produce all documents in the folder. The Agency did so on December 5-7, 2015.

114. On December 8, 2015, following a request by Lockheed Martin that GAO stay issuance of its decision to permit consideration of the newly produced documents, GAO informed the parties that it would not consider these documents in preparing its decision regarding the protest due to the 100 day requirement to issue a decision.

## COUNT I

**The Agency Conducted Misleading Discussions Based
in Part on a Changing Standard for "Meaningful Variation"**

115. Lockheed Martin incorporates by reference and re-alleges the allegations in paragraphs 1-114 of this complaint, as though fully set forth in this claim.

116. During discussions, the Agency informed Lockheed Martin that "a change is a change is a change" and, as such, ████████████████████████████ ███████████████████████████████████████████████. In fact, the Agency did not view all such changes as ████████████████ and viewed most changes as ████████████████████████. Lockheed Martin thus was misled to ████████████████████████████████████████████ ████████.

117. Prior to and during discussions, the Agency maintained a view regarding specific Lockheed Martin design changes that resulted in meaningful variation from the

████████████████████████████████████████████████

EMD configuration and for which it required substantiation. The Agency did not share that information with Lockheed Martin and thus deprived the Company of the opportunity to address the Agency's actual concerns.

118. During discussions, Lockheed Martin inquired if the Agency was calculating a Reliability (MMBHMF) figure, which would have enabled Lockheed Martin to ███████████████████████████████████████████████████████ ████. The Agency said it was not. In fact, both prior to and after the Agency's response, the evaluators calculated MMBHMF figures for the offerors, including Lockheed Martin.

119. The Agency also concluded, during discussions, that it did not understand certain ████████████████ provided by Lockheed Martin in response to discussion question 24B. The Agency never advised Lockheed Martin that it did not understand even though discussions continued. The Agency conceded that its "main message" to Lockheed Martin had been to encourage ███████████████████████████████ — despite the fact that the Agency did not actually believe that ███████████ would be useful. Notwithstanding, the next day, the Agency advised Lockheed Martin that a "change is a change is a change" and encouraged ██████████████████████ ████████████████.

120. The Agency never informed Lockheed Martin of its actual view that the

████████████████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

████████████████.

## COUNT II

### The Agency Conducted an Unequal Evaluation By Failing To Require
### Substantiation for Substantial Changes from its EMD Design from Oshkosh

121.　Lockheed Martin incorporates by reference and re-alleges the allegations in paragraphs 1-120 of this complaint, as though fully set forth in this claim.

122.　The Agency failed to employ any specific and consistent standard for assessing whether proposed designs meaningfully varied from EMD. The documents produced on December 5, 2015 reflect that the Agency concluded early that the Lockheed Martin ████████████████████████ without employing any standard, and later settled on the "potential to cause" a hardware mission failure as a standard.

123.　Lockheed Martin and Oshkosh made ████████ design changes, respectively, from the vehicle configuration that had been tested during the EMD Reliability testing.

124.　In evaluating the Lockheed Martin proposal, the Agency stated that the design ████████████████ because the changes "had the potential to cause" a hardware mission failure.

125.　According to the declaration by the Reliability evaluator for the Agency that was submitted to GAO during the protest proceeding, ████████████ Oshkosh changes had the potential to cause an HMF. Despite the potential to cause an HMF by

48

the Agency's own account, none of these changes was deemed a meaningful variation in design in regard to Reliability.

126.  Oshkosh asserted in its proposal that a ███████████████████████ ████████████████████████████████ In its Primary Technical evaluation document, the Agency concluded that these changes both do not impact Reliability and do impact Reliability, thus contradicting itself.

127.  The Primary Technical document for Oshkosh refers to consideration of ███████████████████ as a basis to determine that the design did not meaningfully vary, stating that "[a]s the changes are" ████████████████ changes, they do not meaningfully vary the design. The Primary Technical for Lockheed Martin does not reflect any such standard.

128.  The Agency failed to consider the impact of certain changes proposed by Oshkosh for LRIP that were not implemented in any test vehicle, including BCN ███ ███████████████ ) which Oshkosh viewed ██████████ ████████ . Instead, the Agency characterized that change during the GAO protest proceeding as a change that was included in test vehicles even though the Oshkosh proposal ████████████ ████████████ The Agency thus did not understand or evaluate the change during its evaluation.

129.  In evaluating the Oshkosh proposal, the Agency failed to consider the impact on prior Reliability fixes of proposed post-EMD changes that affected the same components or subsystems. In evaluating the Lockheed Martin proposal, the Agency

██████████████████████████████████████████

deemed such changes to be meaningful variations that invalidated any reliance on EMD Reliability data.

130. Lockheed Martin submitted a Declaration during the protest identifying ██████████████████████████████████████████████████████████ ██████████████████████████████████████. These changes should have been considered to meaningfully vary from the EMD as-tested configuration. During the GAO proceeding, the Agency did not provide any explanation of why these post-EMD changes were not deemed to meaningfully vary.

## COUNT III
### The Agency Misevaluated Lockheed Martin's Operational Availability

131. Lockheed Martin incorporates by reference and re-alleges the allegations in paragraphs 1-130 of this complaint, as though fully set forth in this claim.

132. The EMD assessment conference assessed value for ████████████ ████████ for Lockheed Martin was ████████████████████████████████ ███████████████████ Lockheed Martin proposed ██████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████.

133. In assessing Lockheed Martin's approach, the Agency relied on ████████ ████████ assigned to Reliability. The Reliability assessment was flawed for the reasons stated above.



134.     Furthermore, the Agency failed to reasonably assess the risk posed by the Lockheed Martin approach and ███████████████████████. Lockheed Martin's proposed Availability ("Ao") value ██████████████████████ ██████████████████████ and thus could not reasonably be ████████████. In fact, the Lockheed Martin vehicle's Reliability ████████████████████ ████████████████████████████████████████████████ ██████████████. The vehicle's Reliability ████████████████████ ████████████████████████████████ Finally, the vehicle's ████████████████████████████████ ████████████████████████████ The Agency's evaluation was arbitrary.

## COUNT IV

**The Evaluators Arbitrarily and Unreasonably Determined that Lockheed Martin**
██████████████████████████████████████████████

135.     Lockheed Martin incorporates by reference and re-alleges the allegations in paragraphs 1-134 of this complaint, as though fully set forth in this claim.

136.     Following the Agency's direction ████████████████ as "a change is a change," Lockheed Martin ████████████████████ ███. The Agency failed to reasonably consider it. As a result, the evaluation was unreasonable.

████████████████████████████████

**The Agency Pressured Lockheed Martin To ████████████████
But Failed to Consider Oshkosh's ██████████████████**

137. Lockheed Martin incorporates by reference and re-alleges the allegations in paragraphs 1-136 of this complaint, as though fully set forth in this claim.

138. In its initial proposal, Lockheed Martin proposed an MMBHMF ████████

████████████████████████████████████ ████ The proposal stated that ████████████████████████████

████████████████████████████████████

██████████████

139. The RFP contemplated that the Agency ████████████████████████

████████████████████████████ In EN24B, the Agency stated that Lockheed Martin's proposal ████████████████

████████████████████████████. Ex. 7 at 153. The Agency cited ██████████████████████████████████. Ex. 2 at 116. ██████████████████████████

████████████████████████████████████

████████████████████████████

██████████████.)

140. The RFP requires that, at contract award, the Purchase Description of the contract will be updated to change the PDFOV-2909 threshold Reliability Requirement to the value that is proposed by the contractor in its proposal. In the case of Oshkosh,

████████████████████████████████████

this new Reliability threshold would be ███ MMBHMF. The statement of work for the LRIP contract requires vehicles be subjected to RQT to demonstrate that the threshold requirement is achieved with the LRIP vehicle configuration. The RQT will be conducted in four sequential phases, with the first two spanning three months and 60,000 total miles each, and the remaining two spanning one month and 20,000 miles each. Statistically, failures will occur during system operations in a random manner and at an average rate determined by the system's actual Reliability capability. To the extent a system's Reliability capability is equal to the requirement that must be demonstrated, the probability that it will satisfy the requirement in any given test is approximately 50%, *i.e.*, there is an equal chance of having more or less than the maximum number of failures required to pass the demonstration.

141.    In its proposal, Oshkosh projected that its vehicles' Reliability capability will be ███ MMBHMF. *See* Ex. 21 at 273. Oshkosh proposed to meet ███ MMBHMF, which is the value that must be demonstrated in the RQT. Because the RQT is structured in four separate phases, Oshkosh will be required to demonstrate ███ MMBHMF in each phase as is required by the contract Statement of Work. If that threshold is not met in any phase, corrective action(s), *i.e.*, design changes, must be developed to address the causes of the inadequate performance, and the RQT must be re-run. This outcome would result in program delays because Initial Operating Capability cannot occur until the RQT is successfully completed. Unless Oshkosh

successfully passes each RQT phase, it is likely that Oshkosh will make additional corrective actions (*i.e.*, design changes), to its vehicles, resulting in a third configuration.

142.    Given that Oshkosh's estimated Reliability of its LRIP configuration is ████, the probability that a vehicle configuration with that capability will successfully pass the first 60,000 mile phase of RQT is approximately ████████████████ ████████████████████████████████████ If Oshkosh passes the first phase, the probability it would then pass the second phase (also 60,000 miles) is also ██ %. The probability of passing the third and fourth phases of 20,000 miles each are ██ % each. Based on the probabilities of passing the successive RQT phases, the total probability of passing the overall RQT is approximately ██████████████ ██████████. Thus, there is more than a ████ probability that a program with a vehicle Reliability capability equal to that proposed by Oshkosh will not pass the required LRIP testing critical to supporting the program's fielding schedule.

143.    In contrast, the original Lockheed Martin proposal offered ██████████ ████████████████████████████████. Lockheed Martin committed that the proposed ██████████████████████████████████████████ ████████████████████████████████████████. Conducting an RQT with a vehicle that has Reliability (after the Reliability Growth Test) of ██████ MMBHMF would result in an ██ % probability to pass an RQT with a requirement of ██████.



144. The Lockheed Martin approach of ████████████████████████████ ██████████████████████████████████████████████████ should have been considered a ██████ risk approach when compared with the Oshkosh plan to conduct the RQT with a ███ % chance of failing to satisfy a lower requirement. In other words, Oshkosh ████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████As the Oshkosh approach was acceptable, the Lockheed Martin approach should have been deemed acceptable.

145. There is no indication in the Primary Technical evaluation documents (or any other materials that have been produced) that the Agency considered the risk that Oshkosh could satisfy the RQT with its estimated Reliability ██████) or will need to resort to a revised (*i.e.*, "third") configuration.

## COUNT VI
### The Agency Erroneously and Prejudicially Deviated from the RFP's Criteria For Weighting Certain Technical Factors

146. Lockheed Martin incorporates by reference and re-alleges the allegations in paragraphs 1-145 of this complaint, as though fully set forth in this claim.

147. The RFP lists three evaluation Factors, and the Primary Technical Factor is the most important of the three. Ex. 1 (RFP § M.1.1). The RFP further establishes 25 Primary Technical requirements or Purchase Description requirements that the Agency must evaluate as part of the Primary Technical Factor. *Id.* (RFP § M.4.1), referencing RFP Attachment 0061. The RFP states: "Each PD requirement identified in Attachment 0061

55

is weighted equally and will be evaluated as such." *Id.* This means that the Purchase Description requirement for Reliability (PDFOV-2909) should not have any greater weight than any of the other 24 Purchase Description requirements for purposes of the Primary Technical evaluation. Each Purchase Description requirement thus carries 1/25th of the overall weight the Agency has to consider as part of the Primary Technical Factor.

148.    The SSEB assigned ███████████████████████████████ ████████████████████████████ to Lockheed Martin's proposal. The vast majority of the ratings—██ out of 25—thus are ██████████████████████████. Yet, the Agency assigned Lockheed Martin ██████████████████████ for the Primary Technical Factor. In doing so, the Agency assigned disproportionate weight to Lockheed Martin's ████████████████ rating—a minority of the 25 Purchase Description requirements that should have been equally weighted. The Agency violated the RFP by giving undue, *i.e.*, more than equal, weight to this minority of the Purchase Description requirements.

149.    The rationale for the Agency's assessment ████████████ to the Primary Technical factor for Lockheed Martin consists of three sentences:





██████████████████████████ .

This makes no sense. The first sentence—which fails to mention Lockheed Martin's ██████ ratings—should have precluded a risk rating ████████ . The second sentence recognizes that all twenty-five Purchase Description requirements "are equally weighted," but then departs from that RFP requirement by asserting that the "number of ████████████████████████ risk ratings"—that number being ██████████████ ████████████████████████████████—that number being ██████ . If the Purchase Description requirements are weighted equally, ██████████ ████████████████████ rating cannot "significantly diminish" ████████████████ ████ ratings and result in an overall rating ████████████ . A minority cannot trump a majority that is ████ times greater.

150.    If one assumes that a different value is assigned to each of the possible risk ratings and calculates an average, the Lockheed Martin rating would average out to ██████ as shown below. This is true regardless of whether Lockheed Martin is assessed a ████████████████████ risk for PDFOV-2909.

| Basic Math Ratings Value | |
|---|---|
| Very Low | 4 |
| Low | 3 |
| Moderate | 2 |
| High | 1 |
| Unacceptable | 0 |

Under the ratings assigned by the SSEB, Lockheed Martin would have received █ points under such a scale (████████████████████████████████████████████

██████████████████████████████████████████████

) for a total of ▮ and average of ▮ across the 25. Based on ▮▮▮▮▮▮ risk assigned by the SSA, this average would ▮▮▮▮▮▮. In either case, the overall rating should equate to an average score ▮▮▮▮▮▮ The Agency instead deemed Lockheed Martin's proposal ▮ ▮▮▮▮▮ by giving undue weight to ▮▮▮▮▮ of the 25) of the Purchase Description requirements.

151.     As shown above, the Agency weighted some requirements – including Reliability (PDFOV-2909) and Availability (PDFOV-2918)—more heavily than others. Because the Agency gave undue weight to Reliability and Availability, Lockheed Martin was prejudiced by the misevaluation of these Purchase Description requirements in the rating for the Primary Technical factor. If the Purchase Description requirements were equally weighted as required by the RFP, Lockheed Martin would have had ▮▮▮▮▮▮▮▮▮

152.     Reliability also had a substantial impact on the evaluated cost/price. The  Oshkosh through its proposed Reliability amount ▮▮▮ ) ▮▮▮▮▮▮ among the remainder of the evaluated cost/price. The ▮▮▮▮▮▮▮ .

*Prayer for Relief*

Lockheed Martin respectfully requests that the Court declare the Agency's decision arbitrary and capricious and contrary to the terms of the RFP.

Specifically, Lockheed Martin requests that the Court:

A.     Declare that the Agency's award to Oshkosh was in violation of applicable statutes and regulations, and was arbitrary and capricious;

B.     Declare that, had the evaluation been conducted properly, the Agency should have awarded the JLTV contract to Lockheed Martin;

C.     Issue an injunction restraining the Agency from proceeding with any performance of the awarded contract to Oshkosh;

D.     Order that the Agency award the JLTV contract to Lockheed Martin;

E.     Alternatively, order that the Agency reopen the JLTV competition, revise the RFP consistent with the Court's decision, conduct additional discussions as necessary, evaluate proposals and award the contract in a manner consistent with the RFP, and applicable statutes and regulations;

F.     Alternatively, award Lockheed Martin its proposal preparation costs and such other costs or damages that the Court deems appropriate; and

G.     Provide such other relief as the Court deems just and appropriate.

Respectfully submitted,

s/ Marcia G. Madsen

_____

Of Counsel:

Maryann Surrick
Lockheed Martin Corporation
6801 Rockledge Drive, MP 203
Bethesda, Maryland 20817
Tel (301) 897-6988

Marcia G. Madsen
David F. Dowd
Cameron S. Hamrick
Luke Levasseur
Polly Myers
MAYER BROWN LLP
1999 K Street, NW
Washington, D.C. 20006
Tel (202) 263-3000
Fax (202) 263-5274

December 16, 2015

Counsel for Lockheed Martin

December 22, 2015
(Resubmitted with citations to exhibit
pages that were consecutively numbered
pursuant to the Court's request.)

**CERTIFICATE OF SERVICE**

I hereby certify that, on December 22, 2015, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification to all counsel of record in this matter who are registered with the Court's CM/ECF system.

s/ Marcia G. Madsen

_____